**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| CHELSEA RAGLAND, TIMOTHY RAGLAND, individually and as parents and next friends of their minor daughter, S. J. R. (minor),<br><br>Plaintiffs,<br><br>v.<br><br>TEXAS DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES; ACH CHILD & FAMILY SERVICES D/B/A OUR COMMUNITY OUR KIDS; ELIZABETH CESPEDES, individually and in her official capacity; PAMELA CLARK, individually and in her official capacity; ALYSSA DOUGHARTY, individually and in her official capacity; SUSAN HOELSCHER-HUFFMAN, individually and in her official capacity; KRISTEN HIGH, individually and in her official capacity; IRENE WILEY, individually and in her official capacity; ERIKA PEREZ, individually and in her official capacity,<br><br>Defendants. | Civil Case No.: 3:26-cv-3477<br><br>JURY TRIAL DEMANDED |

**ORIGINAL COMPLAINT**

Plaintiffs Chelsea Ragland, Timothy Ragland, and S.J.R. (minor) (the "Ragland Family" or "Plaintiffs"), by and through undersigned counsel, bring this Complaint against Defendants Texas Department of Family and Protective Services ("DFPS"); ACH Child & Family Services, d/b/a Our Community Our Kids ("OCOK"); Elizabeth Cespedes, individually and in her official capacity; Pamela Clark, individually and in her official capacity; Susan Hoelscher-Huffman, individually and in her official capacity; Alyssa Dougharty, individually and in her official

capacity; Kristen High, individually and in her official capacity; Irene Wiley, individually and in her official capacity; and Erika Perez, individually and in her official capacity (collectively, "Defendants") and allege, on personal knowledge and information and belief, as follows:

**INTRODUCTION**

1. This case is about what happens when the State manufactures a child-abuse case out of a family's grief. On April 14, 2023, Chelsea and Timothy Ragland lost their two-month-old son, Timothy Ragland, Jr. ("TJ"), to a sudden medical emergency while he was being fed. [redacted] Arlington Police found [redacted] But the State did not wait for the evidence to speak. It invented its own.

2. Within seventy-two hours of TJ's death, the Texas Department of Family and Protective Services ("DFPS") and ACH Child & Family Services, operating as Our Community Our Kids ("OCOK"), filed a petition to remove the Raglands' surviving daughter, S.J.R.—a healthy two-year-old with no injuries, no medical concerns, and no history of abuse. The foundation of that petition was [redacted] That report did not exist. The Medical Examiner later testified under oath that [redacted] The CPS investigator who swore to the affidavit admitted at trial that [redacted] The phrase [redacted] appears in no fewer than fifty-two (52) separate references across the State's records and filings.

3. For more than a year, the State maintained its grip on this family. S.J.R. was removed from her parents and placed with her maternal grandmother under court-supervised

restrictions. Chelsea Ragland, who was not even present when TJ's medical emergency occurred, was nonetheless found culpable of neglectful supervision and physical abuse for the act of leaving her infant son in the care of his father, her husband, in their family home. OCOK threatened both parents with permanent termination of their parental rights if they did not comply with demands unrelated to any demonstrated danger. OCOK's own caseworker admitted under oath that [redacted] The agency adopted a theory of guilt and refused to let go of it—even as every piece of evidence pointed the other way.

4. On April 8–9, 2024, the matter proceeded to a final trial before Judge Kenneth E. Newell in the 233rd Judicial District Court, Tarrant County. At the close of DFPS's case-in-chief, the court granted the parents' motion for directed dismissal and dismissed the petition in its entirety. The Order of Dismissal was signed on May 1, 2024. The State's evidence was legally insufficient to support a single allegation.

5. But the harm did not end there. Despite the court's unequivocal rejection of the State's case, DFPS has maintained both Chelsea and Timothy Ragland on the Texas child-abuser central registry. Both parents are legal professionals. The registry listing carries independent legal consequences: it can preclude employment involving children, prevent adoption, and impose lasting professional harm that directly implicates the character-and-fitness standards governing bar membership. On approximately December 13, 2024 and October 3, 2025, DFPS affirmatively confirmed that the listing would remain, notwithstanding that a court had already found the State's entire evidentiary basis legally insufficient.

6. Plaintiffs Chelsea Ragland, Timothy Ragland, and S.J.R. bring this action under 42 U.S.C. § 1983 and state law to vindicate their constitutional rights, to hold accountable the

individuals and entities that manufactured a case against their family, and to seek redress for injuries that no family should be forced to endure.

## PARTIES

7. Plaintiff Chelsea Ragland ("Mrs. Ragland") is a licensed attorney who, at all times relevant to this Complaint, resided in Arlington, Texas and Grand Prairie, Texas, and was employed at a Haynes & Boone law firm in Dallas, Texas. Mrs. Ragland brings this action individually and as parent and next friend of her minor daughter, S.J.R.

8. Plaintiff Timothy Ragland ("Mr. Ragland"), a legal professional who, at all times relevant to this Complaint, resided in Talladega, Alabama and Grand Prairie, Texas. Mr. Ragland worked for Youth Advocate Programs ("YAP") as National Director of Policy & Governmental Affairs and simultaneously served as the mayor of Talladega, Alabama. Mr. Ragland brings this action individually and as parent and next friend of his minor daughter, S.J.R.

9. Plaintiff S.J.R. is the minor daughter of Chelsea and Timothy Ragland, born on [redacted] 2020, in Atlanta, Georgia. S.J.R. brings this action through her parents as next friends. S.J.R.'s claims are personal to her, and her claims are tolled during her minority under Tex. Civ. Prac. & Rem. Code § 16.001(b).

10. Defendant Texas Department of Family and Protective Services ("DFPS") is a state agency of the State of Texas responsible for investigating reports of child abuse and neglect, managing child-protective-services cases, maintaining the central registry of child-abuse findings, and related functions under the Texas Family Code and Texas Human Resources Code.

11. ACH Child & Family Services, d/b/a Our Community Our Kids ("OCOK"), is a private entity that contracts with the State of Texas to perform the duties of DFPS in Tarrant County, Texas. OCOK's registered agent is Wayne K. Carson, 3712 Wichita St., Fort Worth, Texas 76119. [redacted]

[redacted] *See* Exhibit 1, Tr. Vol. 2 at 68:6-10. As a private entity exercising traditional and exclusive government functions under color of state law, OCOK is a state actor for purposes of 42 U.S.C. § 1983.

12. Defendant Elizabeth Cespedes is or was a CPS Investigator employed by DFPS. Cespedes took over the Ragland investigation as primary investigator on or about April 17, 2023, authored the sworn removal affidavit that formed the basis for S.J.R.'s removal, and entered Reason to Believe findings against both parents. Cespedes is sued individually and in her official capacity.

13. Defendant Pamela Clark is or was a Night Response CPS Investigator employed by DFPS who responded to Methodist Mansfield Medical Center on the night of TJ's death and participated in the initial investigation and interviews. Clark is sued individually and in her official capacity.

14. Defendant Susan Hoelscher-Huffman is or was a DFPS Special Investigator who participated in the investigation of the Ragland family. Hoelscher-Huffman testified [redacted] She is sued individually and in her official capacity.

15. Defendant Alyssa Dougharty is or was a permanency specialist and caseworker employed by OCOK. Dougharty was responsible for case management, service planning, and court filings in the Ragland matter. Dougharty admitted under oath that [redacted] She is sued individually and in her official capacity.

16. Defendant Kristen High is or was a CPS Supervisor employed by DFPS who supervised the investigation of the Ragland family during the relevant period. High conducted

the [redacted] while the investigation remained open, the autopsy report remained pending, and no new evidence had been obtained. As the supervising investigator, High was responsible for ensuring the integrity of the investigative process, including verifying the evidentiary basis for removal, ensuring timely reassessment in light of new information, and correcting investigative deficiencies. High is sued individually and in her official capacity.

17. Defendant Irene Wiley is or was a Permanency Supervisor employed by OCOK who directly supervised Defendant Dougharty and oversaw case management, service planning, and legal strategy in the Ragland matter. As Dougharty's supervisor, Wiley bore supervisory responsibility for OCOK's institutional refusal to consider alternative explanations for TJ's death, the use of termination threats as leverage against the family, and the failure to reassess OCOK's case posture as exculpatory evidence accumulated. Wiley is sued individually and in her official capacity.

18. Defendant Erika Perez is or was a CPS Investigator employed by DFPS who participated in the initial investigation of the Ragland family. On [redacted] Perez is sued individually and in her official capacity.

19. Upon information and belief, each Defendant, acting through its or his/her officers, members, directors, employees, representatives, agents, or receivers, participated in and is responsible for the acts and practices alleged herein. Defendants are jointly and severally liable for the acts of each other through principles of agency, partnership, alter ego, and other forms of vicarious liability.

## JURISDICTION AND VENUE

20. This Court has original federal-question jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983.

21. This Court has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367(a) because those claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

22. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in, or had a direct nexus to, Tarrant County and Dallas County, Texas, both of which lie within the Northern District of Texas. Venue is proper in the Fort Worth Division because substantial events occurred in Tarrant County, which is within the Fort Worth Division of the Northern District of Texas. Plaintiffs Chelsea Ragland and Timothy Ragland, together with their children, resided in Arlington, Texas (Tarrant County) at all relevant times. Defendant DFPS maintained offices and operated in Tarrant County at all relevant times, and it conducted its investigation of the Ragland family in Tarrant County. Defendant OCOK likewise maintained offices and operated in Tarrant County at all relevant times, and it participated in that investigation in Tarrant County. S.J.R. was removed pursuant to proceedings in the 233rd Judicial District Court in Fort Worth, Tarrant County. The April 2024 trial and directed dismissal took place in Fort Worth.

23. Venue is proper in the Fort Worth Division because substantial events occurred in Tarrant County, which is within the Fort Worth Division of the Northern District of Texas. The Ragland family resided in Arlington, Texas (Tarrant County). The DFPS and OCOK investigation was conducted in Tarrant County. S.J.R. was removed pursuant to proceedings in the 233rd Judicial District Court in Fort Worth, Tarrant County. The April 2024 trial and

directed dismissal took place in Fort Worth. DFPS and OCOK maintained offices and operated in Tarrant County at all relevant times.

24. However, venue is also proper in the Dallas Division of the Northern District of Texas because a substantial part of the events or omissions giving rise to the claims occurred in, or had a direct nexus to, Dallas County. During the relevant period, Plaintiff Chelsea Ragland worked at Haynes and Boone, LLP, 2323 Victory Avenue, Suite 700, Dallas, Texas 75219, and she is a current member of the Dallas Women Lawyers Association ("DWLA"), J.L. Turner Legal Association ("J.L. Turner"), and the Dallas Bar Association ("DBA"). Mrs. Ragland suffered the professional consequences of DFPS's continued registry listing at her Dallas County workplace, and she continues to suffer them through her DWLA, J.L. Turner, and DBA memberships. Plaintiff Timothy Ragland works for Youth Advocate Programs ("YAP"), which maintains an office at 8700 N. Stemmons Freeway, Suite 460, Dallas, Texas 75247, and holds contracts with the Dallas Housing Authority. Mr. Ragland is also a member of the Alpha Sigma Lambda chapter of Alpha Phi Alpha Fraternity, Inc. in Dallas, Texas, and he suffers the professional and reputational consequences of the registry listing in both settings. At all relevant times, Mr. and Mrs. Ragland were members of Concord Church in Dallas, Texas, and they remain members today. The children's pediatrician, Dr. Heather K. Baumann, practiced in Dallas. Defendant DFPS operates statewide, including in Dallas County, and it maintains and enforces the registry listing that continues to injure Plaintiffs in Dallas County. Defendant OCOK, a Tarrant County-based contractor, operates within the Dallas County child welfare system. In July 2026, DFPS selected OCOK to assume Community-Based Care services in Region 3E, the Dallas-area region that includes Dallas County, following DFPS's termination of its contract with the Dallas-based provider EMPOWER.

25. Venue is proper in the Dallas Division under 28 U.S.C. § 1391(b)(1)-(2) because DFPS resides in Dallas, and a substantial part of the events giving rise to this action occurred within Dallas County, including the ongoing professional and reputational injuries to Chelsea Ragland and Timothy Ragland.

## FACTUAL BACKGROUND

**The Ragland Family**

26. Chelsea Ragland was born and raised in Arlington, Texas. She and Timothy Ragland were legal professionals with established professional obligations in the Dallas-Fort Worth area, rented a home at 717 Overleaf Way, Arlington, Texas 76002 and maintained substantial community and family ties in Dallas County.

27. The Ragland Family had a substantial support network, including Mrs. Ragland's mother, Veronica Jamerson, who lived nearby. Neither Mrs. Ragland nor Mr. Ragland had any criminal history or any prior involvement with CPS. They had not previously been the subject of a child-abuse or neglect investigation.

28. Mr. and Mrs. Ragland had two children: S.J.R., born [redacted] 2020, in Atlanta, Georgia, and T.R. Jr. ("TJ"), born [redacted] 2023, at Baylor Medical Center in Grapevine, Texas by scheduled cesarean section. TJ remained in the hospital for two days and was then discharged with no special instructions. The only reported complication was jaundice. *See* Exhibit 2, CPS Records (Redacted) previously marked at Bates DFPS.RMG000358.

29. TJ saw a pediatrician five times during his short life. For example, Mr. and Mrs. Ragland noticed TJ was suffering from constipation and immediately took him to the doctor to get his milk changed. Nothing was outstanding at any of those visits. At the last visit, approximately one week before TJ's death, the pediatrician found nothing abnormal. *See* Exhibit 3, previously marked as Ragland Petitioner's Ex. 3.

**TJ's Sudden Death: April 14, 2023**

30. On the evening of April 14, 2023, Chelsea Ragland attended a local sorority event. Timothy Ragland remained at the family home, caring for TJ, who was two months old, and S.J.R., who was approximately two and one-half years old.

31. At approximately 9:30 p.m., Mr. Ragland began feeding TJ formula. TJ began vomiting and exhibiting seizure-like activity. Mr. Ragland immediately called 911 and performed CPR.

32. EMS brought TJ to the emergency department at Methodist Mansfield Medical Center, arriving at 9:59 p.m. with CPR in progress. EMS found TJ pulseless, intubated him, and continued CPR for approximately twenty minutes while transporting him. *See also* Exhibit 4, Methodist Mansfield Medical Center Emergency Dept. Records at 3.

33. At 10:53 p.m., Dr. Bachman pronounced TJ deceased at Methodist Mansfield Medical Center. [redacted] *see also* Exhibit 5, Tr. Vol. 3 previously marked as page 93 of 98.

34. That same evening, Arlington Police Department Homicide Detective Andrew Van Treeck responded to Methodist Mansfield. He observed TJ and interacted with the family. [redacted] *See* Exhibit 2, CPS Records previously marked at Bates DFPS.RMG000354.

**April 15, 2023: The Investigation Begins—and the Fabrication Takes Root**

35. The next morning, April 15, 2023, the Tarrant County Medical Examiner's Office communicated preliminary autopsy observations to Detective Van Treeck. [redacted]

[redacted] *See* Exhibit 2, CPS Records previously marked at Bates DFPS.RMG000354.

36. Detectives reported [redacted] *See* Exhibit 2, CPS Records previously marked at Bates DFPS.RMG000354.

37. At approximately 6:00 p.m., the parents were brought to the Arlington Police Department. CPS Investigator Pamela Clark interviewed Mrs. Ragland with Detective Sumner. Special Investigator Susan Hoelscher-Huffman interviewed Mr. Ragland with Detective Van Treeck. *See* Exhibit 2, CPS Records previously marked at Bates DFPS.RMG00014.

38. While at the Arlington Police Department that day, Investigator Clark observed S.J.R. in the lobby. S.J.R. had no visible injuries and interacted positively with both parents. [redacted] *See* Exhibit 2, CPS Records previously marked at Bates DFPS.RMG00014-15; *see also* Exhibit 6, Ragland Removal Affidavit at 7.

39. The Medical Examiner's information reached CPS through an oral chain. [redacted] No one produced, possessed, or reviewed a written preliminary autopsy report because no such document existed. Dr. Fries later testified under oath that [redacted] *See* Exhibit 7, Tr. Vol. 1 at 167:1–168:1.

40. Despite the absence of a written report, Investigator Clark advised the parents that CPS had concerns based on [redacted] from the Medical Examiner's Office and explained that CPS needed to staff the matter for removal. *See* Exhibit 2, CPS Records previously marked at Bates DFPS.RMG000018.

41. A preliminary home study of Veronica Jamerson's home was also conducted on or about April 18. Ms. Jamerson had no CPS history and no criminal history. [redacted] and Jamerson stated that [redacted] *See* Exhibit 8, Home Study dated April 18, 2023 at 2; *see also* Exhibit 9, Home Study dated April 26, 2023 at 3, 10.

**April 16–18, 2023: The State Moves Against the Family**

42. On April 16, 2023, counsel for the family asked CPS to wait a few days so the family could grieve TJ's death before interviewing S.J.R. *See* Exhibit 7, Tr. Vol. 1 at 175:4–15.

43. The next day, April 17, DFPS contacted S.J.R. at her daycare and spoke with her, in direct disregard of counsel's request. The investigator described the contact as a "talk," but it was an investigatory contact with a two-year-old child whose brother had died three days earlier. DFPS conducted it without any individualized basis to believe that S.J.R. had been abused. *See* Exhibit 7, Tr. Vol. 1 at 175:4–15.

44. On April 17, DFPS received [redacted] CPS Investigator Elizabeth Cespedes received the matter as the primary investigator. *See* Exhibit 2, CPS Records previously marked at Bates DFPS.RMG0000358.

45. That day, Cespedes spoke with Detective Van Treeck. He told her that [redacted]

[redacted] and said [redacted] Cespedes did not speak with Dr. Fries directly and did not review any written report. Instead, she received [redacted] *See* Exhibit 6, Ragland Removal Affidavit at 6.

46. On April 18, 2023, DFPS filed its Original Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship in the 233rd Judicial District Court, Tarrant County, Cause No. 233-732945-23. The court issued an *ex parte* removal and protective order, and S.J.R. was placed with her maternal grandmother, Veronica Jamerson.

47. [redacted] *See* Exhibit 6, Ragland Removal Affidavit at 2.

48. That representation was false. No [redacted] existed, and no written report of any kind had been produced. At trial, Cespedes acknowledged that she [redacted]

[redacted]

*See* Exhibit 7, Tr. Vol. 1 at 167:14-16.

49. The phrase [redacted] ultimately appeared in no fewer than fifty-two separate references across the State's records, filings, and internal communications. Each reference repeated the same unsupported premise and reinforced the affidavit's false foundation for removal.

50. [redacted] No fact supported that characterization. Chelsea was born and raised in Arlington; both parents were legal professionals with professional obligations in the Dallas–Fort Worth area; they rented their Arlington home; S.J.R. was enrolled in local daycare; and the family maintained substantial ties to relatives and the community. Neither parent had ever attempted to evade law enforcement or conceal S.J.R. *See* Exhibit 7, Tr. Vol. 1 at 176:7–20.

**April 21, 2023: The Forensic Interview**

51. On April 21, 2023, S.J.R.—two years old and seven days removed from the death of her baby brother—was compelled to undergo a forensic interview [redacted] *See* Exhibit 2, CPS Records previously marked at Bates DFPS.RMG000036.

52. Throughout the thirteen-minute video-recorded interview, [redacted]

[redacted] *See* Exhibit 2, CPS Records previously marked at Bates DFPS.RMG000036.

53. The interview produced no outcry of abuse, no additional referral, and no information suggesting that S.J.R. was unsafe in her parents' care. CPS nonetheless indicated that [redacted] *See* Exhibit 2, CPS Records previously marked at Bates DFPS.RMG000037.

**The Exculpatory Evidence the State Ignored**

54. The first exculpatory fact existed on April 14, 2023. [redacted] *See* Exhibit 10, American Medical Response Records. Detective Van Treeck then responded to the hospital, observed TJ and the family, and reported [redacted] Neither EMS nor the initial responding officer [redacted] The EMS records and Van Treeck's report were available to law enforcement and CPS. The State nevertheless proceeded the next day to investigate and remove S.J.R. based on autopsy observations relayed

through a hearsay chain. *See* Exhibit 2, CPS Records previously marked at Bates DFPS.RMG0000354.

55. The initial medical presentation on April 14 was also consistent with the parents' account. [redacted] The Methodist Mansfield ER records were available to CPS and OCOK, yet the agencies treated the case as presumptive abuse rather than as a feeding emergency requiring further investigation. *See* Exhibit 5, Tr. Vol. 3, previously marked as page 93 of 98.

56. On April 15, the skeletal examination of S.J.R. at Cook Children's [redacted] CPS had the result before DFPS filed the petition. [redacted] Despite that result, CPS staffed the matter for removal and DFPS filed a termination petition based entirely on injuries to a different child. *See* Exhibit 6, Ragland Removal Affidavit at 7.

57. By April 15, CPS also knew that Chelsea and Timothy were established professionals with no criminal or prior CPS history, a stable Arlington home, professional obligations, and substantial family and community ties. Cespedes nevertheless characterized them as [redacted] in the removal affidavit. The characterization was contradicted by the information available to DFPS and by the parents' conduct throughout the investigation. *See* Exhibit 7, Tr. Vol. 1 at 176:7–20.

58. Between April 15 and April 18, the removal affidavit and the State's filings repeatedly relied on a [redacted] from the Medical Examiner's Office. Dr. Fries later testified that [redacted]

[redacted] The foundational document presented to obtain judicial authorization for removal did not exist, yet the State used the asserted document instead of verifying the source of the medical information. The nonexistent document tainted the chain of authorization that led to S.J.R.'s removal. *See* Exhibit 7, Tr. Vol. 1 at 167:3–168:1; *see also* Exhibit 6, Ragland Removal Affidavit.

59. The April 21 forensic interview was another exculpatory event known to CPS. During the interview, S.J.R. disclosed no abuse and gave no account suggesting that she was unsafe. She repeatedly [redacted] instead. Interviewer Torrance stated [redacted] CPS considered S.J.R. capable of participating in a forensic interview, but when the interview produced no outcry, CPS did not change its prosecution posture. CPS instead [redacted] *See* Exhibit 2, CPS Records previously marked at Bates DFPS.RMG000036-37.

60. On May 9, 2023, Dr. Suzanne Dakil issued a preliminary report to CPS. The report stated that [redacted] and it noted that the [redacted] CPS used the report as support for its abuse allegations while disregarding the [redacted] qualification. Defense counsel did not receive the report promptly. At trial, Cespedes acknowledged that [redacted] *See* Exhibit 7, Tr. Vol. 1 at 171:17–19; *see also* Exhibit 3, previously marked as Ragland Petitioner's Ex. 3.

61. Before the Medical Examiner finalized the forensic work, Cespedes had already made the Department's findings. At trial, she acknowledged:

[redacted]

*See* Exhibit 7, Tr. Vol. 1 at 191:20–24.

62. CPS committed to an abuse-and-neglect theory before the forensic science was complete and did not reconsider when the Medical Examiner later [redacted] At trial Cespedes acknowledged:

[redacted]

*See* Exhibit 7, Tr. Vol. 1 at 193:14-22.

63. From April through December 2023, when Cespedes closed the investigation, she received no new evidence from law enforcement or medical records. The Medical Examiner's final report remained pending for months. Nevertheless, the State continued the case, kept Veronica Jamerson in the home as supervisor, maintained its removal posture, and continued to seek termination of parental rights without a finalized cause of death.

64. In January 2024, CPS entered "Reason to Believe" findings for neglectful supervision and physical abuse against Mrs. Ragland, even though she was not in the home when TJ's medical emergency occurred. She was at the sorority event and was not an alleged perpetrator in the initial intake report, which identified an unknown perpetrator. Cespedes nevertheless treated Chelsea's decision to leave TJ with his father as a basis for findings against her. *See* Exhibit 2, CPS Records previously marked at Bates DFPS.RMG000001-2, DFPS.RMG000059; *see also* Exhibit 7, Tr. Vol. 1 at 187:8–20.

65. Genetic testing was ordered for TJ in approximately September 2023. The Department did not expedite or prioritize the testing, and the results were not available until approximately February 29, 2024—roughly six months later. Had the testing been completed promptly, the information [redacted] would have been available months earlier, potentially resolving the case before trial. Dr. Fries admitted at trial that [redacted] *See* Exhibit 7, Tr. Vol. 1 at 84:12-85:8.

66. On February 29, 2024, GeneDx identified [redacted] The State had the results for over a month, but the defense did not receive it until days before the April 2024 trial. *See* Exhibit 5, Tr. Vol. 3, previously marked as page 52 of 98.

67. On March 27, 2024, Dr. Fries signed the one and only Medical Examiner's report. [redacted] The report stated that [redacted]

[redacted] Despite that conclusion, DFPS proceeded toward final trial seeking termination of the parents' rights. *See* Exhibit 11, Tarrant ME Investigator's Report at 11. The one and only Medical Examiner's report was signed [redacted] but Mr. and Mrs. Ragland's counsel did not receive the report until the Friday eve of trial, April 4, 2024. The defense therefore received the [redacted] cause of death and the related medical evidence only days before trial. Critical exculpatory evidence was withheld until the last possible moment. DFPS continued to rely on its earlier abuse theory rather than disclosing and addressing the evidence when it became available.

68. At trial, Ms. Cespedes acknowledged that [redacted]

[redacted]

*See* Exhibit 7, Tr. Vol. 1 at 165:8–11, 15.

69. At trial, Cespedes acknowledged that [redacted]

[redacted]

*See* Exhibit 7, Tr. Vol. 1 at 172:12-15, 172:23-173:1,174:7-9.

70. At the same trial, Dougharty acknowledged that [redacted]

[redacted]

*See* Exhibit 1, Tr. Vol. 2 at 204:9–12.

**OCOK's Year-Long Institutional Refusal to Reconsider**

71. After S.J.R.'s removal, OCOK managed the family's case from the post-removal period through the pendency of the litigation. Alyssa Dougharty described OCOK as [redacted] *See* Exhibit 1, Tr. Vol. 2 at 68:6–10.

72. OCOK required Chelsea and Timothy to participate in a service plan that included family counseling, individual counseling, and parenting classes. *See* Exhibit 12, Permanency Report dated May 18, 2023. Chelsea and Timothy completed parenting classes. In place of family counseling, S.J.R. attended individual counseling, and Chelsea and Timothy each attended individual counseling and couples counseling. The service plan requirements continued while the State sought to maintain restrictions on the family and pursue termination.

73. OCOK required S.J.R. to stop co-sleeping with her parents, even though co-sleeping had been therapeutic for the family after TJ's death and had not been a reason the case was initiated. S.J.R. woke screaming in the middle of the night on numerous occasions. OCOK would not allow her to sleep with her grandmother, Veronica Jamerson either.

74. OCOK sought termination because Chelsea and Timothy did not share their therapy notes, even though a court order stated that they were not required to provide a release of information for therapy records. OCOK treated the parents' compliance with the judge's order as a basis for pressure rather than honoring the order. That demand and the resulting termination posture were in retaliation against the family for following the judge's order.

75. Dougharty admitted at trial that [redacted]

*See* Exhibit 1, Tr. Vol. 2 at 140:10–12.

76. Dougharty also acknowledged that [redacted] *See* Exhibit 1, Tr. Vol. 2 at 76–77.

77. Despite those admissions, OCOK continued to seek termination and used the threat of permanent termination of parental rights as leverage. Dougharty acknowledged that [redacted] *See* Exhibit 1, Tr. Vol. 2 at 180:11–14.

78. The Department's position remained absolute even after the genetic evidence and the [redacted] Medical Examiner's conclusion. Counsel asked:

[redacted]

*See* Exhibit 7, Tr. Vol. 1 at 164:10–18.

**The Trial and Directed Dismissal: April 8–9, 2024**

79. On April 8–9, 2024, the matter proceeded to a two-day final trial before Judge Kenneth E. Newell in the 233rd Judicial District Court, Tarrant County, Texas. DFPS presented testimony from [redacted] *See* Exhibit 7, Tr. Vol. 1 at 132:8–11.

80. Under cross-examination, Dr. Fries acknowledged that [redacted] He agreed that [redacted] *See* Exhibit 7, Tr. Vol. 1 at 51:23-52:1–7, 56:1–10.

81. Dr. Fries further agreed that [redacted] These findings were absent even though [redacted]

[redacted] *See* Exhibit 7, Tr. Vol. 1 at 62:21–25, 61:6–11, 62:7–9.

82. Dr. Fries also testified that [redacted] He testified that [redacted] *See* Exhibit 7, Tr. Vol. 1 at 110:4–14, 167:25–168:1.

83. Dr. Fries' final determination was [redacted] He acknowledged:

[redacted]

*See* Exhibit 7, Tr. Vol. 1 at 51:20, 115:23–25.

84. Cespedes testified that [redacted] *See* Exhibit 7, Tr. Vol. 1 at 161:16–18, 162:21–24, 172:4–11.

85. Cespedes confirmed that [redacted] She also confirmed that [redacted] *See* Exhibit 7, Tr. Vol. 1 at 191:17–192:3.

86. Cespedes [redacted] say [redacted]. She also acknowledged that [redacted] and that [redacted]

*See* Exhibit 7, Tr. Vol. 1 at 195:8–10, 197:16–18, 171:17–19.

87. At the conclusion of DFPS's case-in-chief, before the defense presented a single witness, counsel for Mrs. Ragland, Mr. Ragland, and Veronica Jamerson [redacted] Chelsea's counsel argued:

[redacted]

*See* Exhibit 1, Tr. Vol. 2 at 207:5-8, 15-18.

88. Counsel for Timothy Ragland argued:

[redacted]

*See* Exhibit 1, Tr. Vol. 2 at 222:15-22.

89. The court granted the motions for directed dismissal. The Department of Family and Protective Services' Original Petition for Protection, Conservatorship, and Termination was dismissed in its entirety. The Order of Dismissal was signed on May 1, 2024, and is a final, appealable order disposing of all parties and issues.

**The Autopsy Photographs and the Delayed Return of TJ's Remains**

90. During the April 2024 trial, the State entered dozens of TJ's autopsy photographs as exhibits. Mr. and Mrs. Ragland were required to sit in the courtroom and see their infant son—the child they held, nursed, and loved—displayed as evidence in a case the court later dismissed for legal insufficiency. The cruelty of that moment cannot be overstated.

91. The parents' last opportunity to see TJ came weeks after his death, after the Medical Examiner's hold on the remains and the investigation delayed their release. By the time the family was permitted to view TJ's body, he was unrecognizable. Mrs. Ragland had hoped that seeing her son one last time would bring some measure of solace; instead, what she saw bore no resemblance to the child she had held. The image remains permanently etched into both parents' memory.

**The Continued Registry Listing**

92. DFPS placed both Mrs. Ragland and Mr. Ragland on the Texas child-abuser central registry with the January 2024 "Reason to Believe" findings. Those findings were entered before the April 2024 trial, before the court evaluated the evidence, and before the Medical Examiner finalized his report.

93. The continued registry listing carries independent legal consequences. It can preclude employment involving children, prevent adoption, and impose lasting professional harm. Mrs. Ragland and Mr. Ragland are both legal professionals, and continued placement on a

child-abuser registry directly implicates the character-and-fitness standards governing bar membership.

94. On December 13, 2024, and again on October 3, 2025, despite the directed dismissal and the absence of any new evidence, DFPS took the affirmative position that the registry listing would remain pursuant to Tex. Fam. Code § 261.002.

95. Mrs. Ragland received her DFPS determination on December 13, 2024, reversing the prior Reason to Believe dispositions and reflecting current dispositions of Ruled Out for Neglectful Supervision of S.J.R. and Unable to Determine for Physical Abuse of TJ. The determination letter and enclosed Request for Removal of Role Information are attached as Exhibit 13.

96. DFPS stated those positions in separate final determination letters issued by the Office of Consumer Affairs. The listing therefore continued after the court had dismissed the Department's entire petition for legal insufficiency.

## COUNT I – 42 U.S.C. § 1983: Fourth Amendment Unreasonable Seizure
## (On Behalf of Plaintiff S.J.R.)
## (Against All Defendants)

97. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

98. The State seized a healthy two-year-old from her parents on the basis of a document that did not exist and injuries to a different child, then maintained that seizure for a year.

99. The Fourth Amendment to the United States Constitution, applied to the States through the Fourteenth Amendment, protects individuals against unreasonable seizures. The

removal of a child from her parents constitutes a seizure within the meaning of the Fourth Amendment.

100. S.J.R.'s physical removal from her parents on April 18, 2023, her involuntary forensic interview on April 21, 2023, and the year-long court-supervised restrictions on her relationship with her parents each constituted seizures of her person.

101. These seizures were unreasonable. The removal affidavit relied upon a fabricated [redacted] that did not exist. Dr. Fries does not issue [redacted] Investigator Cespedes admitted [redacted]

102. There was no individualized evidence of danger to S.J.R.: [redacted] The State lacked reliable evidence establishing a particularized basis to believe S.J.R. faced an imminent threat of harm.

103. Defendants acted under color of state law and caused S.J.R.'s seizure, detention, and continued restriction without a constitutionally adequate basis, in violation of the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

104. As a direct and proximate result of Defendants' conduct, S.J.R. suffered emotional distress from forced separation from her parents during a formative developmental period, the trauma of investigatory questioning and a forensic interview, and the continuing burden of restrictions lasting approximately one year. She is entitled to compensatory damages, punitive damages against the individual Defendants, and all other relief available at law or in equity.

**COUNT II – 42 U.S.C. § 1983: Substantive Due Process — Deprivation of Family Integrity**
**(On Behalf of Plaintiff S.J.R.)**
**(Against All Defendants)**

105. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

106. The State stripped a grieving family of the most basic incidents of parenthood—the right to comfort their surviving child, to be present in her daily life, and to raise her free from coercive government supervision—and maintained that deprivation for a year while every objective indicator confirmed that no danger existed.

107. The parent-child relationship is among the most fundamental liberty interests protected by the Fourteenth Amendment's guarantee of substantive due process.

108. Whatever justification may have initially existed to investigate TJ's unexplained death steadily eroded as exculpatory evidence accumulated. By DFPS's own admission, [redacted] Yet Dr. Fries himself classified [redacted] The State's interest in restricting the family became negligible.

109. Continuing to restrict the parents after the cumulative exculpatory evidence was known, while threatening permanent termination, was arbitrary and conscience-shocking. The conduct of Defendants, individually and in concert, deprived all three Plaintiffs of their fundamental right to family integrity in violation of the Fourteenth Amendment and 42 U.S.C. § 1983.

**COUNT III – 42 U.S.C. § 1983: Fabrication of Evidence — Due Process**
**(On Behalf of All Plaintiffs)**
**(Against All Defendants)**

110. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

111. The State manufactured a factual predicate that did not exist and presented it to a court as if it were real. That fabrication was the foundation for the removal, the restrictions, and the termination petition that followed.

112. The Due Process Clause of the Fourteenth Amendment is violated when state actors fabricate evidence and use it to deprive an individual of a protected liberty interest.

113. CPS investigators referenced a [redacted] from the Tarrant County Medical Examiner's Office in their sworn removal affidavit. That report did not exist. Dr. Fries testified that [redacted] *See* Exhibit 7, Tr. Vol. 1 at 167:1–168:1. Cespedes admitted [redacted] *Id.* at 167:11–19. The nonexistent [redacted] was cited in no fewer than fifty-two (52) separate references across the State's records and filings. The fabrication was material: it supplied the supposed medical foundation for the ex parte removal, the court-supervised restrictions, and the later petition seeking termination.

114. OCOK adopted and prolonged the same fabricated theory rather than correcting it. The state-court order does not break causation where the intermediary's decision was tainted by false or withheld information.

115. The fabricated evidence was the sole basis for the *ex parte* order that resulted in S.J.R.'s physical seizure. It is clearly established that a constitutional violation occurs when a state official makes a knowing, intentional, or reckless false statement that causes the issuance of an order without probable cause, leading to the removal of a child from her parents' custody.

116. The nonexistent [redacted] was the medical foundation for every aspect of the State's intervention against S.J.R. Without it, the affidavit lacked any particularized basis to believe S.J.R. faced imminent danger: [redacted]

117. As a direct and proximate result of the fabricated evidence, S.J.R. was physically removed from her parents, subjected to a forensic interview despite no evidence of abuse, and placed under approximately one year of court-supervised restrictions and mandatory services.

118. The fabricated predicate, rather than reliable evidence of danger to S.J.R., became the foundation for every subsequent restriction on her liberty and her relationship with her parents.

119. A fabricated-evidence due-process claim does not accrue until the favorable termination of the proceeding in which the fabricated evidence was used. As to the removal and trial proceedings, the 233rd District Court's directed dismissal on May 1, 2024, constitutes favorable termination. To the extent the parents' removal-era fabrication claims would otherwise be time-barred, the parents preserve the position that the fabricated evidence continued to support the administrative registry listing and that the fabrication claim did not accrue until the administrative proceedings concluded. Those proceedings concluded when DFPS issued its decisions on December 13, 2024, as to Mrs. Ragland and October 5, 2025, as to Mr. Ragland, respectively. This claim is therefore timely.

**COUNT IV – 42 U.S.C. § 1983: Procedural Due Process**
**(On Behalf of All Plaintiffs)**
**(Against All Defendants)**

120. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

121. The government must provide adequate procedural safeguards before depriving an individual of a protected liberty interest. Those safeguards were lacking at every stage of the State's intervention into the Ragland family.

122. Defendants violated Plaintiffs' procedural due process rights in the following respects, among others:

a. DFPS interviewed S.J.R. at her daycare the day after counsel requested that the family be given time to grieve TJ's death, despite no allegation of abuse or neglect involving S.J.R.;

b. The removal affidavit relied on a fabricated [redacted] that did not exist, depriving the state court of reliable information upon which to base the removal order;

c. Cespedes entered Reason to Believe [redacted]

d. From April through December 2023, the investigation received no new evidence from law enforcement or medical records, yet the State maintained all restrictions without reassessment;

e. Favorable evidence, including Dr. Dakil's report [redacted] was not timely produced to the defense;

f. Genetic testing results identifying [redacted] were not disclosed to the defense until days before the April 2024 trial; and

g. DFPS has continued to maintain the central-registry listing after a court rejected the State's entire evidentiary basis, without meaningful process to reconcile the listing with the directed dismissal.

123. The process was structurally deficient from the start. It rested on an unreliable factual premise, it was never meaningfully corrected as exculpatory evidence accumulated, and it persisted after the judicial rejection of the State's case.

**COUNT V – 42 U.S.C. § 1983: Monell Liability**
**(On Behalf of Plaintiffs Chelsea Ragland and Timothy Ragland)**
**(Against Defendant OCOK)**

124. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

125. OCOK is a private entity that performs the traditional government function of child-protective services under contract with the State of Texas. OCOK's own caseworker described it as [redacted] *See* Exhibit 1, Tr. Vol. 2 at 68:6–9.

126. OCOK is a state actor for purposes of § 1983, and it is subject to *Monell* liability for constitutional violations resulting from its policies, customs, or deliberate indifference.

127. The constitutional violations described in this Complaint were not the product of isolated, unauthorized acts. They were the product of OCOK's institutional policies, customs, and practices, including but not limited to:

a. A policy, custom, or practice of refusing to consider alternative, non-abusive explanations for a child's injuries—even when supported by medical evidence—once an initial theory of abuse has been adopted;

b. A policy, custom, or practice of using the threat of permanent termination of parental rights as leverage to compel parental compliance with demands unrelated to demonstrated danger;

c. A failure to train, supervise, or discipline caseworkers and staff to verify foundational medical information, including the existence of purported medical reports, before relying on that information in sworn filings and court proceedings;

d. A failure to train, supervise, or discipline caseworkers to reassess and revise case plans and legal positions in light of accumulating exculpatory evidence.

128. OCOK's year-long course of conduct, involving case management, service planning, court filings, termination threats, and institutional refusal to reconsider, demonstrates a deliberate indifference to the constitutional rights of the families it is contracted to serve.

**COUNT VI – Intentional Infliction of Emotional Distress**
**(On Behalf of All Plaintiffs)**
**(Against Defendant OCOK)**

129. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

130. Defendants intentionally or recklessly engaged in extreme and outrageous conduct that caused severe emotional distress to each Plaintiff. The conduct at issue includes, but is not limited to:

a. Converting an infant's [redacted] death into findings of physical abuse and neglectful supervision against both parents—including a mother who was not present;

b. Removing a healthy two-year-old child from her parents during the most devastating period of their lives, while they grieved the loss of their infant son, based on a fabricated evidentiary predicate;

c. Compelling a two-year-old to undergo a forensic interview in which she repeatedly [redacted] and had nothing to disclose;

d. Threatening permanent termination of parental rights as leverage, despite the absence of any demonstrated danger to S.J.R.;

e. Forcing Mr. and Mrs. Ragland to sit in a courtroom and view dozens of her deceased infant son's autopsy photographs displayed as exhibits in a case the court would ultimately dismiss for legal insufficiency;

f. Delaying the return of TJ's remains such that the parents' last opportunity to see their son came weeks after his death, at which point TJ was unrecognizable; and

g. Maintaining both parents on the child-abuser central registry after a court rejected the State's entire case.

131. This conduct was extreme and outrageous in context. It intruded on a grieving family's most intimate relationships, relied on fabricated evidence, and persisted after every individualized indicator showed that S.J.R. was safe and that the parents posed no danger.

132. The resulting emotional distress and related injuries are severe.

133. S.J.R. suffered the trauma of forced removal from her parents during a formative developmental period, invasive investigatory questioning and a forensic interview, and approximately one year of court-supervised restrictions and mandatory services—all without any evidence that she was unsafe.

134. The parents suffered, and continue to suffer, the compounded trauma of losing a child, being accused of harming that child, losing access to their surviving daughter while they grieved, and bearing the stigma of a registry listing that a court's own judgment has repudiated.

**COUNT VII – Declaratory Judgment: Unconstitutional Removal**
**(On Behalf of Plaintiffs Chelsea Ragland and Timothy Ragland)**
**(Against All Defendants)**

135. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

136. Pursuant to 28 U.S.C. §§ 2201–2202, Plaintiffs seek a declaratory judgment that DFPS's removal of S.J.R. from her parents and the year-long court-supervised restrictions that followed—imposed without any finding that S.J.R. was abused or neglected—violated the Fourth and Fourteenth Amendments to the United States Constitution.

137. The removal rested on a fabricated factual predicate, S.J.R.'s own examination was unremarkable, no individualized evidence of danger to her existed, and the State maintained its intervention long after any initial justification had dissolved.

**COUNT VIII – Declaratory Judgment: Unconstitutional Registry Placement**
**(On Behalf of Plaintiffs Chelsea Ragland and Timothy Ragland)**
**(Against Defendant DFPS)**

138. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

139. Pursuant to 28 U.S.C. §§ 2201–2202, Plaintiffs Chelsea Ragland and Timothy Ragland seek a declaratory judgment that DFPS's continued maintenance of both parents on the Texas child-abuser central registry after a court rejected its entire case is unconstitutional under the Fourteenth Amendment.

140. DFPS placed the parents on the registry with the January 2024 Reason to Believe findings, and has refused to remove them despite the May 1, 2024, directed dismissal. The registry carries independent legal consequences. Both parents are legal professionals, and continued listing directly implicates the character-and-fitness standards governing bar membership. Maintaining parents on the child-abuser registry after a court found the State's evidence legally insufficient, and without accounting for that favorable determination, deprives them of a protected interest without adequate process.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Chelsea Ragland, Timothy Ragland, and S.J.R. respectfully pray that this Court enter judgment against Defendants and award the following relief:

a) Compensatory damages for each Plaintiff in an amount to be determined at trial, including but not limited to damages for emotional distress, mental anguish, loss of family integrity, loss of parental consortium, invasion of privacy, and professional and reputational harm;

b) Punitive damages against Defendants Cespedes, Clark, Hoelscher-Huffman, Dougharty, High, Wiley, Perez, and all other individual Defendants, in an amount sufficient to deter future constitutional violations;

c) A declaratory judgment that DFPS's removal of S.J.R. from her parents and the year-long court-supervised restrictions violated the Fourth and Fourteenth Amendments to the United States Constitution;

d) A declaratory judgment that DFPS's continued maintenance of Chelsea Ragland and Timothy Ragland on the Texas child-abuser central registry after judicial rejection of the State's case is unconstitutional under the Fourteenth Amendment;

e) Injunctive relief ordering DFPS to immediately remove Chelsea Ragland's and Timothy Ragland's names from the Texas child-abuser central registry and to expunge all records related to the Reason to Believe findings;

f) Attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

g) Pre-judgment and post-judgment interest at the maximum rate allowed by law;

h) Such other and further relief as this Court deems just, equitable, and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all claims and issues so triable.

Dated: October 2, 2026

Respectfully Submitted,

*/s/ Imani N. Maatuka*
Imani N. Maatuka
Texas Bar No. 24125653
Imani@maelaw.net
**MAATUKA AL-HEETI EMKES LLC**
1201 Elm Street
42nd Floor
Suite 4258
Dallas, Texas 75270
Tel.: (214) 945-0169
Fax: (217) 337-0707

Shayla Maatuka *(pro hac vice forthcoming)*
Illinois State Bar No. 6283428
Shayla@maelaw.net
Maatuka Al-Heeti Emkes LLC
2102 Windsor Place, Suite 1
Champaign, IL 61820
Tel.: (217) 337-0700

*Counsel for Plaintiff*